# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### 1:21-CV-758

| | |
|---|---|
| SEAN NEVILLE, AS ADMINISTRATOR OF THE ESTATE OF JOHN ELLIOTT NEVILLE, <br><br>       Plaintiff, <br><br> v. <br><br> WELLPATH LLC; MICHELLE L. HEUGHINS, RN, in her individual and official capacity; BOBBY F. KIMBROUGH, JR., SHERIFF of FORSYTH COUNTY in his individual and official capacity; LAVETTE MARIA WILLIAMS, LIEUTENANT with the Forsyth County Sheriff's Department, in her individual and official capacity; EDWARD JOSEPH ROUSSEL, CORPORAL with the Forsyth County Sheriff's Department, in his individual and official capacity; SARAH ELIZABETH POOLE, Detention Officer with the Forsyth County Sheriff's Department, in her individual and official capacity; CHRISTOPHER BRYAN STAMPER, Detention Officer with the Forsyth County Sheriff's Department, in his individual and official capacity; and ANTONIO MAURICE WOODLEY, Detention Officer with the Forsyth County Sheriff's Department, in his individual and official capacity; FORSYTH COUNTY, <br><br>       Defendants. | **COMPLAINT** |

NOW COMES Plaintiff, the Estate of John Elliott Neville, by and through the undersigned counsel, and complains of Defendants as follows:

## STATEMENT OF THE CASE

1.     John Elliott Neville ("Mr. Neville") died on December 4, 2019, after being transported to the hospital from the Forsyth County Detention Center ("Detention Center"), where he was being held on a misdemeanor charge. Upon his arrival at the Detention Center, Mr. Neville informed jail staff that he was asthmatic, but otherwise seemed to be in good health. Wellpath LLC, the medical provider under contract to provide medical care to inmates and detainees at the Detention Center, prescribed Mr. Neville an inhaler for his asthma that he was to receive four times a day.

2.     His first night in custody, after having missed at least two doses of his inhaler, Mr. Neville experienced a medical emergency that caused him to fall from a top bunk to the concrete floor where he exhibited seizure-like symptoms. A team of detention officers and a registered nurse arrived to render aid to Mr. Neville, who was disoriented, incoherent, and could not comprehend what was happening. Because Mr. Neville was unable to comply with the officers' commands, they placed him in a prone restraint (similar to a hogtie) for a significant period of time, which impaired his respiratory and cardiac systems to the point that he had to be revived multiple times. Well after the onset of Mr. Neville's serious medical symptoms, Detention Center employees or agents finally called for an ambulance to take Mr. Neville to the hospital.

3.     Mr. Neville was transported to the hospital where he died several days later from positional and compressional asphyxiation caused by the manner of restraint used. Not only was the use of a prone restraint on an unarmed, defenseless detainee who was

2

experiencing a medical emergency an entirely unreasonable use of force, but the detention officers and nurse who purported to assist Mr. Neville altogether failed to recognize the seriousness of his condition or to follow the policies set in place for handling inmates or detainees with serious health problems or who are experiencing a medical emergency.

4.     Justice demands that the Defendants bear the consequences of their failure to implement appropriate policies, violations of the Detention Center's policies, and violations of Mr. Neville's constitutional rights, which directly caused Mr. Neville's entirely preventable death.

## PARTIES

5.     Plaintiff, Sean Neville, asserts the claims alleged herein in his capacity as Administrator of the Estate of John Elliott Neville. At all relevant times, Mr. Neville was a citizen and resident of Guilford County, North Carolina.

6.     Defendant Wellpath LLC ("Wellpath") is a limited liability company formed under the laws of the State of Delaware with its principal place of business in Nashville, Tennessee. At all relevant times, Wellpath provided medical and behavioral healthcare services to inmates and detainees held in the Detention Center pursuant to a contract agreed to by the Forsyth County Board of Commissioners ("Board of Commissioners") and the Forsyth County Sheriff's Office. Neither Wellpath nor its predecessor, Correct Care Solutions, appear to be registered with the North Carolina Medical Board, which is required for a limited liability company engaged in the practice of medicine in North Carolina.

3

7.     At all relevant times, Defendant Michelle L. Heughins, RN, was a resident of Forsyth County and was a licensed registered nurse employed by Wellpath who provided medical care to inmates and detainees held in the Detention Center.  To the extent RN Heughins is deemed a public officer, RN Heughins is sued in her individual and official capacity. At all relevant times, RN Heughins was:

      a.     Charged with providing care to inmates and detainees held in custody at the Detention Center;

      b.     Charged with the care, custody, and safekeeping of inmates and detainees held in custody at the Detention Center;

      c.     A "keeper of the jail" pursuant to N.C. Gen. Stat. § 162-55;

      d.     An agent or employee of Wellpath; and

      e.     An agent or employee of Sheriff Kimbrough.

8.     At all relevant times, Defendant Sheriff Bobby F. Kimbrough, Jr. was a resident of Forsyth County, North Carolina and was elected Sheriff of Forsyth County pursuant to Article VII, Section 2 of the North Carolina Constitution and N.C. Gen. Stat. § 162-1. Defendant Kimbrough continues to serve as the Forsyth County Sheriff and is sued in his individual and official capacity. Sheriff Kimbrough's official duties are non-delegable pursuant to N.C. Gen. Stat. § 162-24. At all relevant times, Sheriff Kimbrough was:

      a.     In control of the Detention Center;

      b.     In possession of final decision-making authority over law enforcement policies and personnel who worked for the Sheriff's Department;

4

c.    Directly responsible for the appointment, retention, supervision, training, and conduct of his officers, deputies, employees, and agents;

d.    Acting in the course and scope of his official duties as Sheriff of Forsyth County and under color of state law;

e.    Responsible for the care and custody of the Detention Center;

f.    Responsible for the care and custody of inmates and detainees in the Detention Center, including Mr. Neville, which includes a non-delegable duty to provide appropriate medical care to inmates and detainees at the Detention Center;

g.    The "keeper of the jail" pursuant to N.C. Gen. Stat. § 162-55, and responsible for the appointment of other "keepers of the jail"; and

h.    Vicariously liable for the actions of his officers, deputies, employees, agents, supervisors, managers, and anyone else who worked in the Detention Center.

9.    At all relevant times, Defendant Lieutenant Lavette M. Williams was a resident of Forsyth County, North Carolina and was employed by Forsyth County or the Sheriff as a Lieutenant with the Forsyth County Sheriff's Office. Lieutenant Williams is sued in her individual and official capacity. At all relevant times, Lieutenant Williams was:

a.    Charged with the supervision of all of the operational aspects of the Detention Center, including those of all of the officers, deputies, employees, and agents in the Detention Center;

b.    Directly responsible for the appointment, retention, supervision, training, and conduct of her officers, deputies, employees, and agents at the Detention Center;

c.    Acting in the course and scope of her official duties as an employee or agent of the Sheriff of Forsyth County and under color of state law;

d.    Responsible for the care and custody of inmates and detainees in the Detention Center, including Mr. Neville;

e.    A "keeper of the jail" pursuant to N.C. Gen. Stat. § 162-55; and

5

f.      An agent and employee of Sheriff Kimbrough.

10.     At all relevant times, Defendant Corporal Edward J. Roussel was a resident of Forsyth County, North Carolina and was employed by Forsyth County or the Sheriff as a Corporal with the Forsyth County Sheriff's Office. Defendant Roussel is sued in his individual and official capacity. At all relevant times, Corporal Roussel was:

     a.      Charged with the supervision of certain officers, deputies, employees, and agents in the Detention Center;

     b.      Directly responsible for the supervision, training, and conduct of certain officers, deputies, employees, and agents at the Detention Center;

     c.      Acting in the course and scope of his official duties as an employee of the Sheriff of Forsyth County and under color of state law;

     d.      Responsible for the care and custody of inmates and detainees in the Detention Center, including Mr. Neville; and

     g.      A "keeper of the jail" pursuant to N.C. Gen. Stat. § 162-55; and

     e.      An agent and employee of Sheriff Kimbrough.

11.     At all relevant times, Defendant Sarah E. Poole was a resident of Forsyth County, North Carolina and was employed by Forsyth County or the Sheriff as a Detention Officer with the Forsyth County Sheriff's Office. Officer Poole is sued in her individual and official capacity.

12.     At all relevant times, Defendant Christopher B. Stamper was a resident of Forsyth County, North Carolina and was employed by Forsyth County or the Sheriff as a

6

Detention Officer with the Forsyth County Sheriff's Office. Officer Stamper is sued in his individual and official capacity.

13.     At all relevant times, Defendant Antonio M. Woodley was a resident of Forsyth County, North Carolina and was employed by Forsyth County or the Sheriff as a Detention Officer with the Forsyth County Sheriff's Office. Officer Woodley is sued in his individual and official capacity.

14.     At all relevant times, each of Officers Poole, Stamper, and Woodley were:

    a.    Acting in the course and scope of his or her official duties as an employee of the Sheriff of Forsyth County and under color of state law;

    b.    Responsible for the care and custody of inmates and detainees in the Detention Center, including Mr. Neville;

    c.    A "keeper of the jail" pursuant to N.C. Gen. Stat. § 162-55; and

    d.    An agent and employee of Sheriff Kimbrough.

15.     Defendant Forsyth County ("County" or "Forsyth County") is a political subdivision of the State of North Carolina, organized and governed by the laws of the State of North Carolina.

## JURISDICTION AND VENUE

16.     All events that form the basis of this Complaint occurred in Forsyth County, North Carolina.

17.     This Court has original jurisdiction over the subject matter and parties pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

18. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

19. Venue in this district is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### Background Information About John Neville

20. Mr. Neville was born on March 25, 1963.

21. For his entire adult life, Mr. Neville worked in construction or other related fields.

22. Mr. Neville was married twice and leaves behind five adult children.

23. At the time of his death on December 4, 2019, Mr. Neville was fifty-six years old.

### Mr. Neville Is Held in the Forsyth County Detention Center

24. At approximately 3:25 a.m. on December 1, 2019, Mr. Neville was booked into the Detention Center after being arrested by the Kernersville Police Department on an order for arrest originating from a misdemeanor charge in Guilford County.

25. When Mr. Neville arrived at the Detention Center, he was calm and talkative.

26. As part of the intake process, a Detention Center Medical Intake Form was completed. The form indicated that Mr. Neville informed the individuals responsible for booking and processing him into the Detention Center that he had asthma. A Wellpath form completed when Mr. Neville was booked in the Detention Center shows that Wellpath ordered that Mr. Neville be given an inhaler for his asthma four times daily:  at 5:00 a.m.,

8

10:00 a.m., 5:00 p.m., and 10:00 p.m.  The Forsyth County intake officials took control over the inhaler at the time of Mr. Neville's arrest.  Mr. Neville last used an inhaler for his asthma on December 1, 2019, at approximately 10:43 a.m.

27.     Mr. Neville's intake form also states that he reported suffering from an unspecified non-organic sleep disorder and was allergic to soy, peanuts, and fish.

28.     Mr. Neville was placed into a cell with one other inmate or detainee.

29.     Mr. Neville's cellmate reported that Mr. Neville ate and drank normally the day of December 1, 2019 and took a few naps throughout the day during which he snored. The cellmate stated that the snoring seemed "like he was trying to catch his breath."

30.     Mr. Neville never mentioned any medical problems or complaints of illness to his cellmate.

31.     Mr. Neville and his cellmate went to sleep on the night of December 1, 2019, with the cellmate sleeping on the bottom bunk and Mr. Neville sleeping on the top bunk, which was over four feet above the floor.

<u>Mr. Neville Experiences a Medical Emergency at the Detention Center</u>

32.     Mr. Neville's cellmate was suddenly awoken in the middle of night when he heard a loud bang inside the cell. At first, the cellmate thought that he had been dreaming, but then he saw Mr. Neville on the concrete cell floor, shaking violently from what appeared to the cellmate to be a seizure.

33.     The cellmate leapt out of bed and pressed the emergency call button in the cell to alert those responsible for inmates in the Detention Center that help was needed.

9

34.     Detention Center personnel arrived and removed the cellmate from the cell he shared with Mr. Neville.

35.     RN Heughins and a Special Response Team unit comprised of, *inter alia*, Defendants Roussel, Poole, Stamper, and Woodley (collectively, the "SRT Unit") were deployed to Mr. Neville's cell.

36.     At 3:26 a.m., the SRT Unit found Mr. Neville on the cell floor with vomitus on his clothing and blood around his mouth. Mr. Neville was sweating, his eyes had a glazed appearance, and he initially experienced seizure-like symptoms.

37.     Upon finding Mr. Neville in this state, the SRT Unit rolled up bedding or clothing and placed it under Mr. Neville's head.

38.     At this point, Mr. Neville was not responsive to verbal commands but made audible groaning noises.

39.     RN Heughins, an employee of Wellpath who responded to Mr. Neville's cell, described that Mr. Neville was lying on his right side, snoring, and unresponsive. She reported that his pupils were reactive to light.

40.     RN Heughins applied a "sternal rub" to Mr. Neville, which involves the application of a painful stimulus by using a closed fist and rubbing one's knuckles up and down the center of the chest of a patient who is unresponsive and does not respond to verbal stimuli.

41.     The sternal rub elicited a response from Mr. Neville. His eyelids opened and he regained consciousness, although he was incoherent, seemed confused, was

10

uncooperative, and tried to sit up, kick, and swing his arms. Detention Center staff told Mr. Neville he was not in trouble but was having a medical emergency and needed to calm down and stop resisting. RN Heughins told Mr. Neville that he had a seizure.

42.    The SRT Unit restrained Mr. Neville on his back with his arms and legs pinned down. Mr. Neville yelled incoherently and again became unresponsive. RN Heughins again applied a sternal rub causing Mr. Neville to regain consciousness. Mr. Neville was sweating profusely and his breathing was labored the entire time the SRT Unit was restraining Mr. Neville.

43.    When he regained consciousness, Mr. Neville was still disoriented, causing him to try to kick his legs, jerk his arms away, and thrash his body side to side. RN Heughins attempted unsuccessfully to obtain Mr. Neville's blood pressure. Although Mr. Neville mumbled incoherently, certain statements were intelligible. For example, Mr. Neville said, "Let me go," "Help me up," and "Mama" plus a few other disconnected phrases. He did not respond to the nurse's questions.

44.    Disoriented and confused, Mr. Neville continued trying to free himself from the SRT Unit's hold. The SRT Unit covered Mr. Neville's head with a "spit mask."

45.    The SRT Unit secured metal restraints to Mr. Neville's ankles and rolled him onto his stomach to handcuff his wrists. While on his stomach, Mr. Neville repeatedly asked the SRT Unit to "help me" and to "hurry up." Mr. Neville also yelled "hurry up, hurry, I can't breathe" while officers were attempting to handcuff him. As

11

the SRT Unit was preparing to move him, Mr. Neville was breathing heavily and making wheezing noises.

46.     Once his hands and feet were restrained, the SRT Unit got Mr. Neville on his feet. Mr. Neville walked with assistance to a restraint chair where he was secured with straps around his torso and/or ankles. His hands remained handcuffed behind his back (rather than in the wrist straps on the armrests of the chair) and his ankles remained in metal restraints.

<u>Mr. Neville Is Moved to Another Cell and Placed in a Prone Position</u>

47.     Once Mr. Neville was secured in the restraint chair, the SRT Unit transported Mr. Neville to a multipurpose room on a different floor of the Detention Center. Corporal Roussel asked Mr. Neville if he was alright, and Mr. Neville said, "no." While moving Mr. Neville, the SRT Unit noticed that Mr. Neville had experienced fecal incontinence.

48.     During transport to a different floor of the Detention Center, Mr. Neville seemed confused and said, "Help me." Even after he had been in the restraint chair for several minutes, Mr. Neville's breathing was labored.

49.     Once in the multipurpose room, RN Heughins again tried to obtain Mr. Neville's blood pressure but was unsuccessful. When RN Heughins asked if Mr. Neville knew where he was, he said, "no." Mr. Neville repeatedly asked the SRT Unit and RN Heughins to help him.

12

50.     The SRT Unit then planned to move Mr. Neville to a single cell for observation. Outside of the cell, the SRT Unit discussed their plan for placing Mr. Neville on the floor of the cell, with Corporal Roussel directing another detention officer to place the mattress on the floor so that they could put Mr. Neville on the mattress.

51.     While the SRT Unit was preparing to move Mr. Neville into the cell, Mr. Neville pleaded for his "cylinder." On information and belief, Mr. Neville was requesting his asthma inhaler. Neither the SRT Unit, RN Heughins, nor anyone else provided Mr. Neville with an inhaler, despite Mr. Neville not having received the 5:00 p.m. or 10:00 p.m. doses of his inhaler that Wellpath indicated Mr. Neville needed on his intake forms.

52.     In order to move Mr. Neville into a cell, the SRT Unit removed the chair restraint straps. Mr. Neville complied with their instructions in getting out of the restraint chair. He walked with assistance into the cell, kneeled down, and was lowered onto a mattress that had been removed from the bunk and placed on the cell floor. Mr. Neville was placed on the mattress in a prone position, face down on his stomach, with his hands still handcuffed behind him and his ankles in metal restraints.

53.     While in the prone position, Mr. Neville continued writhing, moving his torso, and tensing his arms and legs. The SRT Unit restrained him by holding his shoulders, arms, and legs.

13

54.     The SRT Unit then removed Mr. Neville's ankle restraints and forced his legs in a trifold position with his heels near his buttocks. While being placed in this position, Mr. Neville pleaded for help and to be let up, stating that he could not breathe.

55.     While in this position, Mr. Neville also uttered the phrase "turn over" at least twice. On information and belief, Mr. Neville was imploring the SRT Unit to turn him over so he could breathe.

56.     The SRT Unit then attempted to remove Mr. Neville's handcuffs. During the initial attempt, about 2½ minutes after Mr. Neville was placed in a prone position, the handcuff key broke off in the left handcuff. The SRT Unit could not unlock the handcuff using another handcuff key. As the SRT Unit was attempting to remove Mr. Neville's restraints, he stated, "I can't breathe," approximately thirty times. Corporal Roussel told Mr. Neville that he was breathing because he was talking and yelling.

57.     After he had been in a prone position for approximately 3½ minutes, Mr. Neville uttered the last intelligible phrase he ever made.

58.     Corporal Roussel asked another member of the SRT Unit or other detention officer assisting to restrain Mr. Neville to take his place so he could "go talk to the Lieutenant." Lieutenant Williams, who had come to the cell, directed Corporal Roussel to straighten Mr. Neville's legs out so that he could breathe. On information and belief, Lieutenant Williams was the officer-in-charge of the Detention Center overnight from December 1 to December 2 when Mr. Neville suffered his life-ending injuries and was informed of, involved in, and ultimately responsible for decisions

14

made by the SRT Unit and other Detention Center employees and agents during that time.

59. Approximately 4 minutes after Mr. Neville was placed in a prone position, the SRT Unit straightened his legs, which remained in restraints.

60. The SRT Unit brought a set of bolt cutters to the cell to try to cut the handcuffs off of Mr. Neville's wrists. But, the bolt cutters malfunctioned and would not cut through the handcuffs. By this point, Mr. Neville had been in a prone position for about 5 minutes.

61. Mr. Neville stopped moving.

62. Corporal Roussel stated that someone needed to go to the armory to get another set of bolt cutters and, rather than allowing Mr. Neville to sit up or rolling him onto his side, Corporal Roussel told the SRT Unit and other detention officers who were assisting to "hold fast." Corporal Roussel asked if each member of the SRT Unit and other officers who were assisting were alright. Only after Mr. Neville began groaning did Corporal Roussel ask Mr. Neville if he could hear him and explained that they were going to cut the handcuffs off of him. After several more minutes, and again checking on the detention officers holding Mr. Neville down to ask if they were alright, Corporal Roussel asked Mr. Neville if he was alright. Mr. Neville responded by groaning, which Corporal Roussel stated he took "as a yes." In discussing the plan for removing Mr. Neville's restraints once the second pair of bolt cutters arrived, one of

15

the officers acknowledged that Mr. Neville was, by this point, "asleep," *i.e.*, unconscious.

63.     After the other set of bolt cutters were brought from the armory, the SRT Unit was finally able to cut through the left handcuff and remove Mr. Neville's handcuffs approximately 12 minutes after they first placed him in a prone position. Detention Center staff then removed Mr. Neville's blue jumpsuit. Instead of sitting Mr. Neville up or rolling him onto his back or side, RN Heughins attempted to check Mr. Neville while he was in the prone position. After RN Heughins checked Mr. Neville, the SRT Unit and RN Heughins left Mr. Neville alone in the observation cell, lying prone on the mattress, and closed the cell door.

Mr. Neville Becomes Non-Responsive but Is Revived by Emergency Medical Services

64.     After RN Heughins said she could not see Mr. Neville breathing or moving, the SRT Unit reentered the cell, rolled Mr. Neville into a supine position on his back, and secured his arms and legs.

65.     RN Heughins then examined Mr. Neville and could not find a pulse. She began performing external chest compressions. About 19 minutes after Mr. Neville was placed prone, RN Heughins began performing cardiopulmonary resuscitation ("CPR") with the use of a CPR mask that was placed over Mr. Neville's mouth.

66.     When CPR was ineffective to revive Mr. Neville, the SRT Unit brought an automated external defibrillator to the cell and applied it to Mr. Neville's chest.

However, the defibrillator was not ultimately used on Mr. Neville because the machine gave a "no shock advised" reading on three assessments.

67. Then, Forsyth County Fire Department and Emergency Medical Services ("EMS") personnel arrived and requested that Mr. Neville be moved to the multipurpose room just outside of the observation cell. Once there, EMS continued performing CPR and Advanced Cardiovascular Life Support ("ACLS") procedures for 10-15 minutes until Mr. Neville's pulse rate and blood pressure returned in what is known as "return of spontaneous circulation" ("ROSC") at 4:35 a.m. While EMS was performing CPR and ACLS, the SRT Unit restrained Mr. Neville's arms and legs.

EMS Transports Mr. Neville to the Hospital Where He Dies a Few Days Later

68. After ROSC, EMS transported Mr. Neville, unrestrained, to the emergency department of Wake Forest Baptist Medical Center ("Hospital").

69. Upon information and belief, before Mr. Neville was transferred to the Hospital, the EMS personnel were given a handwritten note from Captain C. Warren on Sheriff's office stationary that provided a phone number and stated, "call if and when there is a time of death and if an autopsy is performed. We need to know yes or no. Thank you." The callousness of this note demonstrates that correctional defendants were more concerned with the potential fallout from their treatment of Mr. Neville than they were for Mr. Neville's wellbeing.

70. Mr. Neville arrived at the Hospital at 5:02 a.m. on December 2, 2019. He was unresponsive and had a blood pressure of 220/200. Mr. Neville's heart rate and

17

blood pressure dropped to bradycardic and hypotensive levels. His pulse then stopped. Medical providers at the Hospital performed CPR and administered epinephrine and sodium bicarbonate to Mr. Neville. After 6 minutes of CPR, Mr. Neville's pulse returned.

71.     Mr. Neville then became pulseless a second time. Medical personnel again administered epinephrine and sodium bicarbonate to Mr. Neville and performed CPR for about 3 minutes before his heart began beating again.

72.     A portable chest radiograph was performed the day Mr. Neville was admitted to the hospital and showed no acute cardiac or pulmonary abnormalities.

73.     Mr. Neville was admitted to the medical intensive care unit with a Glasgow Coma Scale of 3.

74.     Mr. Neville's condition continued to deteriorate while he was in the ICU, with Mr. Neville experiencing multi-system organ failure.

75.     A chest X-ray performed on Mr. Neville on December 4, 2019 detected lower lobe opacifications, which suggest atelectasis (a complete or partial collapse of the entire lung or area of the lung) or aspiration (liquid or solid material in the subglottic lower respiratory tract).

76.     The Hospital also collected a tracheal aspirate (tracheal secretions for culture and microbiological diagnosis), which grew *Staphylococcus aureus* and *Escherichia coli*.

77.     On December 4, 2019, Mr. Neville died at the Hospital.

18

Mr. Neville's Autopsy Shows He Died from Positional and Compressional Asphyxia.

78.     Following Mr. Neville's death, a medicolegal autopsy was performed on Mr. Neville's body on December 5, 2019.

79.     The autopsy report listed Mr. Neville's cause of death as "[c]omplications of hypoxic ischemic brain injury due to [c]ardiopulmonary arrest (resuscitated) due to [p]ositional and compressional asphyxia during prone restraint." (emphasis added).

80.     The autopsy report noted that Mr. Neville had a few abrasions on his forehead and left arm and scattered contusions on his back and left upper arm.

81.     The report also noted that Mr. Neville suffered from certain natural disease processes, including asthma, chronic obstructive lung disease (emphysema), mild cardiomegaly (enlarged heart), and mild coronary artery stenosis (narrowing of the arteries of the heart).

82.     The pathologist who performed Mr. Neville's autopsy also ordered toxicological testing of blood drawn from Mr. Neville on December 2, 2019, while he was still alive. Those tests detected desloratadine (an antihistamine), but no ethanol or other drugs in Mr. Neville's system.

Mr. Neville's Treatment at the Detention Center Violated the Medical Services Plan

83.     The Medical Services Plan or the "Plan" created by Wellpath's predecessor and adopted by the Forsyth County Board of Commissioners requires that all correctional staff receive training in how to recognize the need for emergency care and intervention in life-threatening situations and how to recognize acute

19

manifestations of chronic illnesses, such as asthma and seizures. (OPS-100_C-04, § 5.3.)

84.　The Plan also contains a policy intended to ensure that hospitalization is available to inmates or detainees in need of those services. (OPS-100_D005, § 1.)

85.　The Plan also contains a policy to ensure that the Detention Center provides 24-hour emergency medical services to inmates and requires that "**in the event of a life- or limb-threatening emergency, the patient is sent to the hospital in the most expedient way possible . . . .**" (OPS-100_E-08, §§ 1, 8 (emphasis in original).)

86.　Mr. Neville also constitutes a special needs inmate under the Plan's policy, which is to ensure that a proactive program exists that provides care for special needs patients who require close medical supervision. (OPS-100_G-02, § 1.) The Plan defines "Special Needs" to include chronic illnesses such as asthma, heart disease, and seizure disorder. (*Id.* § 5.1.1.) Despite Mr. Neville constituting a special needs patient under the Plan, Mr. Neville's Patient Profile Summary from Wellpath included in his booking records state that Mr. Neville had "No Active Special Needs."

87.　The Plan also addresses the use of restraints and "strongly encourages the use of a bed designed to accept therapeutic restraints, rather than a restraint chair for the purpose of therapeutic restraints." (OPS-100_I-01, § 3.) The Plan also provides that metal or hard plastic restraints such as handcuffs or leg shackles will not be used as medical restraints. (OPS-100_I-01, § 5.) When correctional staff orders the use of

restraints for security reasons (as opposed to therapeutic reasons), healthcare staff should be notified so that they can review the inmate or detainee's medical record for contraindications or accommodations required, to provide health monitoring of the inmate or detainee; and notify the Health Care Practitioner immediately if the restricted inmate or detainee has a medical condition so that appropriate orders can be given. (*Id.* § 5.3.2.)

88. Lastly, the Plan contains policies regarding the use of Metered Dose Inhalers ("MDI Inhalers") for inmates or detainees "requiring treatment for asthma or chronic obstructive pulmonary disease." (9OPS-100_D-02A.) The Plan recognizes that individuals with asthma "often use inhalers as part of their treatment regimens" and/or "for rescue use when an exacerbation develops." (*Id.* § 3.) The Plan is largely concerned with the use of a device that allows inmates or detainees to share inhalers as a cost-effective way to provide inhalers, especially in short stay settings. However, the Appendix to this portion of the Plan states, "It is also important to note that patients with true asthma or COPD exacerbations should have immediate or near-immediate access to rescue medications. Failing to provide such treatment can turn a mild exacerbation into a life threatening event."

89. Notwithstanding that Mr. Neville, on account of his asthma, was a special needs inmate, and in violation of the Plan's relevant provisions, when Mr. Neville suffered a medical emergency, the SRT Unit and RN Heughins (a) failed to consider whether Mr. Neville needed an inhaler or to provide one when Mr. Neville was

21

pleading for help, even though he was wheezing and his breathing was labored, and (b) failed to call an ambulance to take him to the hospital for approximately one hour after Mr. Neville's life-threatening medical emergency began. In the meantime, they placed him in improper restraints that ultimately caused his death.

90.     Nor did RN Heughins, the SRT Unit, or anyone else working at the Detention Center recognize the extreme danger posed by placing a special needs patient who was in distress in a prone position that compromises respiration and cardiac functions. Mr. Neville's intake forms should have alerted the SRT Unit and RN Heughins that he was a special needs inmate who needed access to an emergency inhaler for his asthma. Mr. Neville's fall from his bunk, seizure like symptoms, non-responsiveness, labored breathing, wheezing, and incoherence should have alerted them that Mr. Neville was in need of emergency treatment from hospital providers. Instead, in direct violation of the Plan, Sheriff Kimbrough's employees and agents not only failed to provide Mr. Neville with an inhaler or send him to the hospital but also placed him face down with his arms and legs restrained behind him for an extended period of time.

91.     As a result, Mr. Neville suffered a terrifying, preventable, and totally unnecessary death, as a direct result of his being in the sole custody and control of the Sheriff and at the mercy of Defendants.

92.     Defendants' actions, individually and combined, directly led to and caused Mr. Neville's suffering and death.

93.     Defendants' actions violated Mr. Neville's clearly established and well-settled fundamental rights under the United States Constitution, including the right to be free from excessive force; the right to adequate, necessary and emergency medical care while in custody; the right to due process before being deprived of his life; the right to substantive due process under the Fourteenth Amendment; and other inalienable rights retained by him as a citizen regardless of his circumstances in custody.

<u>The Aftermath of Mr. Neville's Death</u>

94.     The State Bureau of Investigation opened an investigation into Mr. Neville's death.

95.     During the SBI investigation, Sheriff Kimbrough's office made no public statement about Mr. Neville's death and took no disciplinary action against the Detention Center staff involved in the death of Mr. Neville.

96.     In April, SBI Special Agent in Charge Scott Williams completed his investigation and turned over his findings.

97.     On June 2, 2020, Sheriff Kimbrough placed Corporal Roussel on administrative leave with pay.

98.     Officer Poole was suspended without pay for three days beginning on June 26, 2020, which was the first day the Sheriff's Office publicly acknowledged Mr. Neville's death. Poole was then placed on a 12-month probationary period.

99.     On July 2, Sheriff Kimbrough placed Lieutenant Williams on administrative leave with pay.

23

100.   On July 7, 2020, Sheriff Kimbrough fired four of the five detention officers involved in the response to Mr. Neville's medical emergency. His letters of termination referenced state law that gives Sheriff Kimbrough the authority to hire, discharge, and supervise the employees in his office.

101.   On July 8, 2020, the Forsyth County District Attorney announced that he had charged Defendants Williams, Roussel, Poole, Stamper, Woodley, and Heughins with involuntary manslaughter in connection with their treatment of Mr. Neville.

102.   Charges against these Defendants remain pending in Forsyth County Superior Court. (Case Nos. 20CR056842; 20CR056843; 20CR056844; 20CR056845; 20CR056846; 20CR056847.)

103.   On August 4, 2020, one day before the court-ordered release of detention officers' bodycam footage showing Mr. Neville's treatment at the Detention Center, Sheriff Kimbrough held a press conference at which he apologized to Mr. Neville's family for the death of Mr. Neville and acknowledged that "mistakes were made that day." Sheriff Kimbrough told Mr. Neville's family that their "father has changed the way health care will be dispensed at the Forsyth County detention center . . . ."

104.   On January 4, 2021, RN Heughins voluntarily surrendered her nursing license and agreed not to practice nursing in North Carolina while the involuntary manslaughter charge was pending against her. As part of the agreement suspending her license, the North Carolina Board of Nursing found as facts that:

> On December 2, 2019 during [RN Heughins]'s shift, an inmate at the Forsyth County Detention Center experienced a medical event during

which [RN Heughins] provided care. It is alleged [RN Heughins], and Forsyth County detention staff who were restraining the inmate, did not call Emergency Medical Services for approximately forty-five minutes while the inmate was experiencing a medical emergency in which the inmate was having difficulty breathing. It is further alleged that the inmate was restrained by detention officers in a prone position despite complaining of respiratory distress. Additionally, the inmate suffered from asthma, and it is alleged that he missed two prior breathing treatments while in the detention center. . . .

(Temporary Suspension Agreement ¶ 4.)

105.   RN Heughins stipulated that "[t]he conduct described above, as alleged and if proven true, would constitute a violation of the provisions of Article 9A of the Nursing Practice Act and the rules enacted by the Board in 21 N.C. Admin. Code 36 .0217(a) within the meaning of N.C. Gen. Stat. §90-171.37(7)."

<u>Forsyth County Renews Wellpath's Contract Despite Repeated Incidents</u>

106.   Upon information and belief, Wellpath is the country's largest correctional healthcare company, providing care for approximately 300,000 inmates and detainees in about 550 jails.

107.   Wellpath's predecessor in interest, Correct Care Solutions, LLC ("Correct Care"), has contracted with Forsyth County since at least 2012 to provide inmate healthcare services at the Detention Center.

108.   On July 23, 2012, the Board of Commissioners adopted a Resolution awarding a contract to provide inmate healthcare services for the Detention Center and the Forsyth County Youth Center to Correct Care.

25

109.   On September 1, 2012, Forsyth County executed a contract with Correct Care for Correct Care to provide medical services to inmates and detainees at the Detention Center for a term to run from September 1, 2012 through August 30, 2015. The contract could be extended in one-year increments for up to seven additional years. The estimated amount of the contract was for $11.7 million dollars over the three-year term. The contract set firm prices for on-site and off-site medical care. The County agreed to pay $1.2 million for the cost of off-site medical care plus 50% of all costs associated with off-site medical care. Correct Care agreed to pay the other 50% of costs for off-site medical care. There was no set cap on the amount the County would have to pay to cover its half of off-site medical care costs. The 2012 contract was signed by the then-acting sheriff and the County manager.

110.   On August 10, 2015, the County Board of Commissioners adopted a resolution extending the 2012 contract with Correct Care for another year, from September 1, 2015 through August 31, 2016. The County's cost for off-site medical care was set at $429,614 for the one-year term of the contract and again obligated the County and Correct Care to share the costs of off-site medical care equally. The amendment capped the County's liability for its 50% share of off-site medical costs at $475,958 unless the County Manager gave his prior written consent through an amendment to the contract. The amendment approving the one-year extension of the contract was signed by the then-current sheriff and the County Manager.

111.    With the anticipated expiration of a further renewal of the contract with Correct Care, which was set to expire on August 31, 2017, the Board of Commissioners issued a request for proposals for the provision of healthcare services at the Detention Center. The Board of Commissioners directed the request to 12 vendors and posted the request to the State Interactive Purchasing System where another 19 vendors requested the proposal. Although 5 vendors attended a pre-bid conference, only Correct Care submitted a bid for the contract to provide medical services at the Detention Center.

112.    Forsyth County received Correct Care's bid on March 31, 2017.

113.    On June 12, 2017, at a meeting of the County Board of Commissioners, a member of the public who was a social worker gave public comments about several recent deaths at the Detention Center that were allegedly related to inadequate medical care being provided at the Detention Center by Correct Care. The individual who spoke specifically raised two pending lawsuits related to inadequate medical care at the Detention Center as well as two recent deaths at the Detention Center. The member of the public who spoke asked that something be done immediately, including an investigation of the recent deaths at the Detention Center.

114.    Upon information and belief, the public comments given at the June 12, 2017, Board of Commissioners' meeting referred to separate lawsuits filed by the estates of individuals who died at the Detention Center or after being transported to a hospital from the Detention Center. The first was filed by the estate of Dino Vann Nixon against Forsyth County, the then-sheriff of Forsyth County, Correct Care, and

other individuals employed by Forsyth County, the then-sheriff, or Correct Care alleging that, because Correct Care medical personnel assigned to the Detention Center failed to give Mr. Nixon his prescribed medication or treat his serious medical condition, Mr. Nixon was found unresponsive at the Detention Center on August 5, 2013, and died at a hospital that same day. The second was field by the estate of Jennifer Eileen McCormack Schuler against Correct Care and medical providers employed by Correct Care to provide medical services to inmates and detainees at the Detention Center, alleging that the defendants denied Ms. Schuler (who was three-months pregnant at the time) an anti-nausea medicine that had been prescribed by her doctor prior to her arrest, causing her to die of hypoxic brain injury, acute kidney failure, and dehydration after being transported to the hospital from the Detention Center.

115. Upon information and belief, the public comments given at the Board of Commissioner's meeting also referred to the deaths in May 2017 of Deshawn Lamont Coley and Stephen Antwan Patterson. Mr. Coley's estate later sued Correct Care, Wellpath, and healthcare providers employed by Correct Care to provide medical services at the Detention Center, alleging that when Mr. Coley was an inmate or detainee at the Detention Center, the defendants refused Mr. Coley's repeated requests for an asthma inhaler, causing his death on May 2, 2017, from acute exacerbation of asthma. Mr. Patterson's estate later sued Correct Care and healthcare providers employed by Correct Care to provide medical services at the Detention Center,

alleging that, after the defendants failed to properly treat his high blood pressure that was in a range that required immediate intervention and ignored his serious medical symptoms, Mr. Patterson was found unresponsive and died on May 26, 2017.

116. Notwithstanding concerns about Correct Care, County staff rated Correct Care's bid for price, past performance and technical/management ability, and the County Manager recommended approval of the new contract with Correct Care, noting that Correct Care's "proposal represents a significant savings for the County over the current contract."

117. On July 13, 2017, the Board of Commissioners held a public meeting at which it considered whether adopt the resolution proposed by the County Manager and award a new three-year contract to Correct Care.

118. At the July 13, 2017 meeting, three additional members of the public spoke at the meeting to raise concerns about the proposed new contract with Correct Care. These citizens raised concerns about recent deaths at the Detention Center and Correct Care's willingness or ability to provide adequate medical care to inmates and detainees in the County's custody. One person raised concerns about protection for inmates and detainees' constitutional rights and commented that, since 2004, Correct Care has been named as a defendant in over 1,000 lawsuits alleging, *inter alia*, violations of inmates and detainees' civil rights, medical malpractice, and wrongful death.

119.    During a debate among the Board of Commissioners about whether to award a new contract to Correct Care, one of the Commissioners asked the County Manager whether the County Health Department could provide medical care to inmates and detainees at the Detention Center if the Board of Commissioners did not award a new contract to Correct Care. The County Manager responded that, "if we were to do that at the point that we are right now, we would really be doing that really in a crisis planning mode, I would say, because we know we've got to have healthcare professionals in that facility upon the expiration of this in August" because the County does "not have any physicians that work for the health department." Instead a local hospital system "provides medical direction for the Health Department, and for EMS, and really all of our medical related things." Several commissioners recommended reissuing a request for proposal or seeking another vendor with whom to contract to provide medical care at the Detention Center because of the serious concerns that exist about Correct Care's provision of medical care.

120.    Despite concerns about Correct Care's provision of medical services at the Detention Center, by a 5-2 vote, the Board of Commissioners accepted the recommendation of the County Manager and the then-sheriff to adopt a resolution awarding a new contract to Correct Care to provide healthcare services to inmates and detainees housed at the Forsyth County Detention Center. The contract term was from September 1, 2017 through August 31, 2020, and was for a fixed amount totaling over $13 million. The contract could be extended in one-year increments for an additional

30

3 years. The contract again provided for the County and Correct Care to equally share the cost of off-site healthcare for inmates and detainees. The County's total costs for offsite healthcare over the three-year term was capped at $1.6 million and could not be raised unless the County Manager agreed to amend the contract in writing.

121. On information and belief, in 2018, Correct Care merged with Correctional Medical Group to create Wellpath, which assumed Correct Care's contract with Forsyth County.

122. On May 21, 2020, the Forsyth County Board of Commissioner resolved to renew the initial contract with Wellpath for an additional year, to run through August 31, 2021.

123. Sheriff Kimbrough was supportive of the decision to renew the contract with Wellpath, stating that "[w]e are grateful WellPath has stepped up and continued to be responsive and make appropriate changes."

124. The Wellpath contract was extended notwithstanding Wellpath's repeated involvement in lawsuits alleging they failed to provide proper care to inmates or detainees at the Detention Center. From 2012 through 2017, Wellpath or Correct Care was named as a defendant in at least 4 lawsuits arising from an inmate's death at the Detention Center. Three of those cases have been settled and another remains pending.

125. Wellpath and its predecessor's improper treatment of patients is not limited to the Detention Center, but spans across the country. Since its formation in

2018, Wellpath has been named in 305 lawsuits in federal court. Correct Care Solutions has been named in 1,992 federal lawsuits.

126.    Nor is Wellpath's misconduct limited to the quality of medical care it provides. On October 24, 2019, Wellpath's CEO and founder, Gerard Boyle, was indicted by the United States Attorney for the Eastern District of Virginia in connection with allegations that he bribed a Virginia sheriff to secure contract extensions. He was indicted on six federal charges, including honest services mail fraud, conspiracy to commit honest services mail fraud, conspiracy to obtain property under color of official right, and conspiracy to commit money laundering.

127.    It was not until May 6, 2021, that Forsyth County decided to discontinue Wellpath's contract to provide medical care to inmates and detainees at the Detention Center by adopting a resolution to award the contract to provide medical care at the Detention Center to NaphCare, Inc., beginning on September 1, 2021.

## THE COUNTY DEFENDANTS WAIVED IMMUNITY

128.    Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

129.    To the extent that any or all Defendants claim they are a municipal or government or county-owned, operated, or funded entity or an employee or agent of such entity, all such Defendants waived any potential governmental immunity or sovereign immunity defense for any of the acts or omissions alleged in this Complaint.

130. All individual Defendants are specifically sued in their individual capacity and in their official capacity.

131. To the extent that the non-law enforcement Defendants, i.e., Wellpath and RN Heughins, claim that they are not subject to the claims alleged in this Complaint because they were not employees of the County or Sheriff Kimbrough, they have waived this argument. Plaintiff specifically pleads the non-delegable duty owed to an inmate or detainee by a Sheriff, or his employee or all "keepers of the jail" as a waiver of such a claim or defense.

132. To the extent that Sheriff Kimbrough makes any claim that he is not responsible for the actions of the non-correctional officer Defendants because they were hired under a contract and not as his direct employees, he has waived this argument. Plaintiff specifically pleads that the Sheriff and his employee are all "keepers of the jail" who owe a non-delegable duty to an inmate or detainee in the Sheriff's custody, which acts as a waiver of any such claim or defense. Sheriff Kimbrough is vicariously liable for the actions and non-actions of the non-law enforcement Defendants who, at all relevant times, were acting under color of state law like the rest of Sheriff Kimbrough's employees or all "keepers of the jail."

133. In the alternative, and on information and belief, at all relevant times, Sheriff Kimbrough, and any and all agents, employees, officers, nurses, jailers, deputies, or other health care providers who worked for him at the Detention Center, waived any potential governmental immunity or sovereign immunity defense because they are insured under

33

additional bonds or insurance or participated in a local governmental risk pool pursuant to N.C. Gen. Stat. §§ 153A-435 and 58-23 that covers the acts or omissions alleged in this Complaint.

134.    At all relevant times, Sheriff Kimbrough, and any and all of his agents, employees, officers, nurses, jailers, deputies, or other health care providers who worked at the Detention Center were covered by liability insurance policy or policies purchased by the County and have, therefore, waived any potential governmental immunity or sovereign immunity defense that could have been raised to the Complaint to the extent of such policies.

135.    At all relevant times, Sheriff Kimbrough, and any and all of his agents, employees, officers, nurses, jailers, deputies, or other health care providers who worked at the Detention Center, waived any potential qualified immunity defense.

136.    To the extent that Defendants have not expressly waived any qualified immunity defense, no such defense can apply given the overt negligent and grossly negligent violations of Mr. Neville's constitutionally-protected rights while he was in the custody and control of Sheriff Kimbrough and all of the other Defendants.

      a.     It was established in July 2017, pursuant to the Medical Services Plan created by Wellpath's predecessor and adopted by the Forsyth County Board of Commissioners, that healthcare staff, employees, and agents of the Sheriff working at the Detention Center had to:

           i.     provide 24-hour emergency medical care to inmates and detainees;

34

    ii.  contact on-call physicians and the correctional supervisors to notify them of a medical emergency as soon as the situation allows;

    iii.  in the event of a life-threatening emergency, the inmate or detainee is sent to the hospital in the most expedient way possible; and

    iv.  provide inmates or detainees suffering from asthma with immediate or near-immediate access to an inhaler.

  b.  The issue of positional asphyxiation, particularly caused by the use of the prone restraint position, had been extensively discussed in the law enforcement community since at least the 1990s and 2000s. It has long been understood that a prone restraint causes respiratory compromise, which, in turn, compromises cardiac functioning.

Thus, when Mr. Neville was housed in the Detention Center in December 2019, there were (1) actual policies directly on point that Defendants chose to ignore or willfully violate and (2) well-established evidence that use of a prone restraint position creates a significant risk of asphyxiation. Defendants' conduct in not obtaining emergency medical care for Mr. Neville and instead placing him in a prone restraint position demonstrates an intentional and reckless disregard for Mr. Neville's safety.

  137.  Upon information and belief and at all relevant times, Sheriff Kimbrough, and any and all of his agents, employees, officers, nurses, jailers, deputies, or other health care providers who worked at the Detention Center, waived any potential public official immunity defense. To the extent that Defendants have not expressly waived any public official immunity defense, no such defense can apply. These Defendants' overt, grossly

35

negligent conduct in violating a simple policy that Sheriff Kimbrough and the County enacted and their collective and individual failure to render appropriate medical care for Mr. Neville and in instead placing Mr. Neville, an asthmatic, in a prone restraint for an extended period shows that they acted with malice, willfulness, and reckless disregard of his safety. These Defendants' conduct was willful and wanton, malicious, and a reckless and egregious disregard of the easily applied policy that would have unquestionably prevented Mr. Neville's death.

**COUNT ONE**
**Violation of Federal Civil Rights Laws, 42 U.S.C. §§ 1983 and 1988**
**(Against Wellpath)**

138.    Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

139.    Wellpath acted individually under the color of state law, customs, practices, usage, or policy at all times mentioned herein as the County's and Sheriff's agent pursuant to their non-delegable duty to provide appropriate medical care to inmates and detainees at the Detention Center and the duties imposed upon them with regard to the treatment and care they provided Mr. Neville.

140.    Wellpath was deliberately indifferent to the serious medical needs of Mr. Neville, as a person suffering from asthma and other conditions who exhibited seizure-like symptoms and labored breathing, which required immediate emergency treatment.

Case 1:21-cv-00758-CCE-JEP   Document 1   Filed 09/28/21   Page 36 of 74

141.    Wellpath and its employees or agents knew immediately upon encountering Mr. Neville in his cell in the early morning hours of December 2, 2019, that he was experiencing a serious or life-threatening emergency.

142.    The Plan required that Wellpath and its employees or agents send Mr. Neville to the hospital in the most expedient way possible.

143.    Notwithstanding Wellpath's and its employees or agents' knowledge that Mr. Neville was a special needs patient who was experiencing a serious or life-threatening emergency, no one called emergency services to transport Mr. Neville to the hospital for approximately one hour. Instead, Wellpath and its employee or agent stood by while Mr. Neville was placed in a dangerous prone restraint without instructing the SRT Unit that the restraint was inappropriate for Mr. Neville, both as a special needs inmate with asthma and as an inmate displaying serious medical symptoms that included labored breathing and complaints that he was unable to breathe.

144.    At all relevant times, it was Wellpath's widespread custom, policy, or practice to deny inmates and detainees access to emergency medical services because such services constitute off-site services that increase costs for both Wellpath and the County.

145.    At all relevant times, it was Wellpath's widespread custom, policy, or practice to deny inmates and detainees access to needed medications, even when such medications have been ordered, because such services increase Wellpath's costs to administer on-site care.

146.    The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Fourteenth Amendment to the United States Constitution. This is a right that any reasonable medical care provider in a similar position as Wellpath should and would have known and did in fact know. In fact, the Plan that the County and the Sheriff put in place for the Detention Center, which was drafted and proposed by Wellpath's predecessor Correct Care, made clear that inmates or detainees experiencing serious or life-threatening emergencies must be taken to receive emergency care as expeditiously as possible.

147.    As a direct and proximate result of Wellpath's deprivations and violations of Mr. Neville's constitutional and federally protected rights as alleged herein, Mr. Neville's life-threatening medical condition went unaddressed for approximately one hour before emergency services were called, during which time he was placed in an improper prone restraint that compromised his respiratory and cardiac function. As a result, he died a slow, painful, terrifying, preventable, and completely unnecessary death. Consequently, Plaintiff, on behalf of Mr. Neville's Estate, is entitled to recover from Wellpath damages in an amount in excess of $25,000.00.

148.    Furthermore, Plaintiff, on behalf of Mr. Neville's Estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish Wellpath for its illegal, unconstitutional, egregiously wrongful, reckless, and willful misconduct and to deter others from engaging in similar conduct in the future.

38

## COUNT TWO

**Violations of Federal Civil Rights Laws, 42 U.S.C. §§ 1983 and 1988**
**(Against RN Heughins in Her Individual Capacity)**

149. Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

150. Defendant RN Heughins acted individually under the color of state law, customs, practices, usage, or policy at all times mentioned herein as the Sheriff's agent or employee pursuant to his non-delegable duty to provide appropriate medical care to inmates and detainees at the Detention center and the duties imposed upon them with regard to the treatment and care they provided Mr. Neville.

151. RN Heughins violated Mr. Neville's rights under the United States Constitution, including rights secured by the Fourth and Fourteenth Amendments, or federal law, by intentionally, willfully, maliciously, and with conscious and deliberate indifference, failing to secure adequate and reasonable medical care for Mr. Neville when she knew or should have known that Mr. Neville faced an obvious and substantial risk of harm, and by further disregarding such risk by failing to take reasonable measures or apply the simple policies set forth in the Plan, which were readily available, to avoid that risk.

152. RN Heughins had actual or constructive knowledge that Mr. Neville was asthmatic, had experienced symptoms of a seizure, had labored breathing, and was incoherent and disoriented. RN Heughins did not send Mr. Neville to receive the medical attention that he needed, but instead stood by as the SRT Unit placed Mr. Neville in unsafe

39

restraint positions, contrary to the Plan. Nor did RN Heughins at any time instruct the SRT Unit that the prone restraint applied to Mr. Neville was dangerous to his health and safety.

153.    The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Fourteenth Amendment to the United States Constitution. This is a right that any reasonable medical care provider in a similar position as RN Heughins should and would have known and did in fact know. In fact, Sheriff Kimbrough had policies in place for individuals working in the Detention Center to properly identify special needs patients, medical emergencies, and chronic conditions, to provide hospital care in a life-threatening situation, and to not use restraints that are inappropriate.

154.    RN Heughins also violated directly applicable North Carolina state laws. It is not possible, given the normal expectations of health care providers in general, much less in light of the express language in the Plan and the law, that RN Heughins can claim she was unaware of what should have happened to avoid violating Mr. Neville's constitutionally protected rights in this situation. RN Heughins has acknowledged that, if true, the allegations against her (i.e., that Mr. Neville missed two doses of his breathing treatments while in the Detention Center, that RN Heughins failed to call emergency medical services for Mr. Neville for approximately one hour while he suffered a medical emergency, and that Mr. Neville was held in a prone restraint despite complaining of respiratory distress) would constitute violations of statutes and administrative rules

applicable to RN Heughins. As a result, the defense of qualified immunity is unavailable to, and has been waived by, RN Heughins.

155.    As a direct and proximate result of RN Heughins' deprivations and violations of Mr. Neville's constitutional and federally protected rights as alleged herein, Mr. Neville's life-threatening medical condition went unaddressed for approximately one hour before emergency services were called, during which time he was placed in an improper prone restraint that compromised his respiratory and cardiac function. As a result, he died a slow, painful, terrifying, preventable, and completely unnecessary death. Consequently, Plaintiff, on behalf of Mr. Neville's Estate, is entitled to recover from RN Heughins, in her individual capacity, damages in an amount in excess of $25,000.00.

156.    Furthermore, Plaintiff, on behalf of Mr. Neville's Estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish RN Heughins for her illegal, unconstitutional, egregiously wrongful, reckless, and willful misconduct and to deter others from engaging in similar conduct in the future.

**COUNT THREE**
**Violations of Federal Civil Rights Laws, 42 U.S.C. §§ 1983 and 1988**
**(Against Sheriff Kimbrough and Lieutenant Williams**
**in Their Official and Individual Capacities)**

157.    Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

158.    At all relevant times, Sheriff Kimbrough and Lieutenant Williams were responsible for the formulation and execution of policies regarding the custody, care, and safekeeping of inmates and detainees at the Detention Center

41

159.    At all relevant times, Sheriff Kimbrough and Lieutenant Williams were responsible for the formulation and execution of policies regarding the medical care provided to inmates and detainees at the Detention Center.

160.    Upon information and belief and at all relevant times, Sheriff Kimbrough, and Lieutenant Williams were acting under color of state law, had in effect de facto policies, practices and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of the officers or medical care providers who worked at the Detention Center, as alleged above, including, *inter alia*:

  a.    Failing to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Detention Center in the proper methods or policies for identifying serious medical conditions or medical emergencies in inmates and detainees;

  b.    Failing to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Detention Center in the proper methods or policies for evaluating inmates and detainees with serious medical conditions or who are experiencing medical emergencies;

  c.    Failing to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Detention Center in the proper methods or policies for assisting and treating inmates and detainees with serious medical conditions or who are experiencing medical emergencies;

  d.    Failing to adequately train, supervise, instruct, or monitor detention officers or medical care providers assigned to the Detention Center in the proper methods or policies for placing inmates and detainees in appropriate restraints for therapeutic or correctional purposes;

  e.    Failing to see that proper methods or policies were being employed by detention officers or medical care providers

assigned to the Detention Center to evaluate the conditions of inmates and detainees in the Detention Center;

f. Failing to see that proper methods or policies were being employed by detention officers or medical care providers assigned to the Detention Center to assist and treat inmates and detainees in the Detention Center with serious medical conditions or experiencing a medical emergency;

g. Failing to draft or institute proper or appropriate policies or procedures necessary to ensure that inmates and detainees are provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

h. Failing to ensure that detention officers or medical care providers assigned to the Detention Center were trained or familiar with proper policies or procedures necessary to ensure that inmates and detainees are provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

i. Failing to ensure that detention officers or medical care providers assigned to the Detention Center complied with proper policies or procedures necessary to ensure that inmates and detainees are provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

j. Failing to ensure that detention officers or medical care providers assigned to the Detention Center were trained or familiar with the Plan as it relates to medical emergencies, special needs inmates, or restraints;

k. Failing to ensure that detention officers or medical care providers assigned to the Detention Center complied with the Plan as it relates to medical emergencies, special needs inmates, or restraints;

l. Failing to ensure that detention officers or medical care providers who worked at the Detention Center complied with existing policies and procedures;

43

m.  Failing to ensure that detention officers or medical care providers who worked at the Detention Center complied with applicable statutes and administrative codes; and

n.  Other policies, customs, and practices to be identified during the course of discovery or trial.

161.  Upon information and belief, Sheriff Kimbrough and Lieutenant Williams had actual or constructive knowledge that the detention officers, medical care providers, supervisors, agents, or employees who worked at the Detention Center were, and had been prior to December 2019, engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates and detainees, such as Mr. Neville.

162.  Upon information and belief, since Wellpath's predecessor contracted to provide medical care to inmates and detainees being held in the Detention Center in 2012, at least six other inmates or detainees had died at the Detention Center or after being transported to a hospital from the Detention Center, at least four of whom were alleged to have died as the direct result of being denied appropriate medical care while being held in the Detention Center. Upon information and belief, the Sheriff did not take appropriate action to correct these earlier failures by instituting new policies or by providing any further training to or supervision of his officers, employees, and agents regarding their handling of inmates' or detainees' medical needs. Sheriff Kimbrough and Lieutenant Williams thus demonstrated a deliberate indifference to and callous disregard of the safety and wellbeing of inmates and detainees in their custody at the Detention Center.

163.    Upon further information and belief, prior to Mr. Neville's death, Sheriff Kimbrough and Lieutenant Williams were each aware that many law enforcement agencies had banned the practice of placing inmates, detainees, or arrestees in a prone restraint similar to a hog tie because of the known, substantial danger that such restraints pose. The Sheriff was or should have been particularly aware of the risk that prone restraints create because Mr. Neville was not the first inmate at the Detention Center to die from being placed in a prone restraint. Upon information and belief, in 1992, a female inmate or detainee died at the Detention Center after being placed face down in a cell with her hands and ankles bound. Notwithstanding their knowledge that using a method of restraint like that used on Mr. Neville creates a substantial risk of serious injury or death, neither sought to prohibit the practice or to implement policies and procedures to instruct its officers, employees, and agents on proper methods of restraint. Upon information and belief, Sheriff Kimbrough was aware that numerous law enforcement agencies had banned the use of prone restraints and the reasons for banning such restraints (that they were inherently dangerous to human life) but took no action to consider whether such a ban should be instituted at the Detention Center. Sheriff Kimbrough and Lieutenant Williams thus demonstrated a deliberate indifference to and callous disregard of the safety and wellbeing of inmates and detainees in their custody at the Detention Center.

164.    Upon information and belief, Sheriff Kimbrough's and Lieutenant William's response to such actual or constructive knowledge, even after repeated instances of injury or death to other inmates and detainees, was so inadequate as to show deliberate

indifference to or tacit authorization of the offensive practices described herein. In fact, by their conduct, Sheriff Kimbrough and Lieutenant Williams created and encouraged a culture of neglect and indifference towards inmates and detainees in the Detention Center.

165. As a direct and proximate result of said policies, practices, and customs, Mr. Neville's rights under the United States Constitution, including rights secured by the Fourth and Fourteenth Amendments, and by other federal laws were violated.

166. The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Fourteenth Amendment to the United States Constitution, and is a right which any reasonable sheriff in the position of Sheriff Kimbrough or lieutenant in the position of Lieutenant Williams would have known. Indeed, a remotely appropriate application of the Plan as it relates to medical emergencies, special needs inmates, or restraints, by any of the individuals Sheriff Kimbrough or Lieutenant Williams were responsible for hiring, training, and supervising, would have completely prevented Mr. Neville's death while in their control. It is not possible, given the normal expectations of jailers in general, much less in light of the express language in the Plan, that Sheriff Kimbrough or Lieutenant Williams can claim they were unaware of what should have happened to avoid violating Mr. Neville's constitutionally protected rights in this situation. As a result, the defense of qualified immunity is unavailable to, and has been waived, by Sheriff Kimbrough and Lieutenant Williams.

167. The right to be free from excessive force is a clearly established constitutional right, pursuant to the Fourth and Fourteenth Amendments to the United

46

States Constitution. Mr. Neville's right to be free from excessive force, particularly as an unarmed pretrial detainee who was experiencing a medical emergency, is a right which any reasonable sheriff or lieutenant in the position of Sheriff Kimbrough or Lieutenant Williams would have known. These Defendants' conduct in failing to institute appropriate policies for use of force and restraints on an inmate or detainee such as Mr. Neville and in failing to adequately train, supervise, or instruct detention officers or medical care providers on the use of force and restraints or to monitor such violated Mr. Neville's constitutional rights as alleged herein.

168.    As a direct and proximate result of these Defendants' deprivation of Mr. Neville's constitutional and federal rights as alleged herein, Mr. Neville's life-threatening medical condition went unaddressed for approximately one hour before emergency services were called, during which time he was placed in an improper prone restraint that compromised his respiratory and cardiac function.  As a result, he died a slow, painful, terrifying, preventable, and completely unnecessary death. Consequently, Plaintiff, on behalf of Mr. Neville's Estate, is entitled to recover from Sheriff Kimbrough and Lieutenant Williams, in their individual capacities, damages in an amount in excess of $25,000.00.

169.    Furthermore, Plaintiff, on behalf of Mr. Neville's Estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish Sheriff Kimbrough and Lieutenant Williams for their illegal, unconstitutional, egregiously

47

wrongful, reckless, and willful misconduct and to deter others from engaging in similar conduct in the future.

## COUNT FOUR
**Violations of Federal Civil Rights Laws, 42 U.S.C. §§ 1983 and 1988**
**(Against Corporal Roussel and Officers Poole, Stamper, and Woodley in Their Official and Individual Capacities)**

170.    Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

171.    At all relevant times, Corporal Roussel and Officers Poole, Stamper, and Woodley were responsible for the execution of policies regarding the custody, care, and safekeeping of inmates and detainees at the Detention Center.

172.    At all relevant times, Corporal Roussel and Officers Poole, Stamper, and Woodley were responsible for the execution of policies regarding the medical care provided to inmates and detainees at the Detention Center.

173.    Upon information and belief and at all relevant times, Corporal Roussel and Officers Poole, Stamper, and Woodley were acting under color of state law, and had in effect de facto policies, practices and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of the officers or medical care providers who worked at the Detention Center, as alleged above, including, *inter alia*:

    a.    Failing to comply with the proper methods or policies for identifying serious medical conditions or medical emergencies in inmates and detainees;

    b.    Failing to comply with the proper methods or policies for evaluating inmates and detainees with serious medical conditions or who are experiencing medical emergencies;

48

c.      Failing to comply with the proper methods or policies for assisting and treating inmates and detainees with serious medical conditions or who are experiencing medical emergencies;

d.      Failing to comply with the proper methods or policies for placing inmates and detainees in appropriate restraints for therapeutic or correctional purposes;

e.      Failing to comply with the proper methods or policies to evaluate the conditions of inmates and detainees in the Detention Center;

f.      Failing to comply with policies or procedures to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

g.      Failing to be familiar with policies or procedures necessary to ensure that inmates and detainees were provided appropriate, necessary, and adequate medical care and protection from emergency and perilous medical conditions;

h.      Failing to be familiar with the Plan as it relates to medical emergencies, special needs inmates, or restraints;

i.      Failing to comply with the Plan as it relates to medical emergencies, special needs inmates, or restraints;

j.      Failing to comply with existing policies and procedures;

k.      Failing to comply with applicable statutes and administrative codes; and,

l.      Other negligence and failure to comply with policies, customs, and practices to be identified during the course of discovery or trial.

174.    Upon information and belief, Corporal Roussel and Officers Poole, Stamper, and Woodley had actual or constructive knowledge that the detention officers, medical care

49

providers, supervisors, agents, or employees who worked at the Detention Center were, and had been prior to December 2019, engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates and detainees, such as Mr. Neville.

175.    Corporal Roussel and Officers Poole, Stamper, and Woodley had actual or constructive knowledge that Mr. Neville was a special needs patient who was experiencing a serious or life-threatening emergency, but failed to call emergency services to transport Mr. Neville to the hospital for approximately one hour. Instead, Corporal Roussel and Officers Poole, Stamper, and Woodley placed Mr. Neville in a dangerous prone restraint and held him in that position for an excessive period of time, notwithstanding that Mr. Neville was displaying serious medical symptoms that included labored breathing and complaints that he was unable to breathe.

176.    Upon information and belief, the responses of Corporal Roussel and Officers Poole, Stamper, and Woodley to such actual or constructive knowledge, even after repeated instances of injury or death to other inmates and detainees, was so inadequate as to show deliberate indifference to or tacit authorization of the offensive practices described herein. In fact, by their conduct, these Defendants created and encouraged a culture of neglect and indifference towards inmates and detainees in the Detention Center.

177.    As a direct and proximate result of said policies, practices, and customs, Mr. Neville's rights under the United States Constitution, including rights secured by the Fourteenth Amendment, and under other federal laws were violated.

50

178.    The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Fourteenth Amendment to the United States Constitution, and is a right which any reasonable sheriff, officer, agent, medical care provider, or employee in the position of each of these Defendants would have known. Indeed, a remotely appropriate application of the Plan, as it relates to medical emergencies, special needs inmates, or restraints, by any of these Defendants or the people they were directly responsible for hiring, training, and supervising, would have completely avoided Mr. Neville's death while in their exclusive care, custody and control. It is not possible, given the normal expectations of jailers in general, much less in light of the express language in the Plan, that these Defendants can claim that they were unaware of what should have happened to avoid violating Mr. Neville's constitutionally protected rights in this situation. As a result, the defense of qualified immunity is unavailable to, and has been waived by these Defendants.

179.    In addition, the right to be free from excessive force is a clearly established constitutional right, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution. Mr. Neville's right to be free from excessive force, particularly as an unarmed pretrial detainee who was experiencing a medical emergency, is a right which any reasonable sheriff, officer, agent, medical care provider, or employee in the position of each of these Defendants would have known. Mr. Neville was being housed as a pretrial detainee who was arrested on a misdemeanor charge. Moreover, Mr. Neville was in an incoherent and debilitated state such that he could not think clearly and, as a result, was

51

writing and trying to free himself from these Defendants. Mr. Neville was unarmed, having a medical crisis, and did not pose an immediate threat to the safety of detention officers or others. These Defendants' conduct in placing Mr. Neville in a prone restraint for an extended period of time under these circumstances amounts to an excessive use of force in violation of Mr. Neville's protected rights.

180. As a direct and proximate result of these Defendants' deprivation of Mr. Neville's constitutional and federal rights as alleged herein, Mr. Neville died a slow, painful, terrifying, preventable, and totally unnecessary death while in the custody of the Detention Center and totally unable to fend for himself. Consequently, Plaintiff, on behalf of Mr. Neville's Estate, is entitled to recover from each of these Defendants, in their individual capacities and official capacities, compensatory damages in an amount in excess of $25,000.00.

181. Furthermore, Plaintiff, on behalf of Mr. Neville's Estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) from each of these Defendants, in their individual capacities, to punish these defendants for their illegal, unconstitutional, egregiously wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

**COUNT FIVE**
**Violations of Federal Civil Rights Laws, 42 U.S.C. §§ 1983 and 1988**
**(Against Forsyth County)**

182.   Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

183.   Forsyth County is governed by the Board of Commissioners, which funds the Detention Center and is responsible for the provision of medical care to inmates and detainees who are held in custody at the Detention Center. N.C. Gen. Stat. §§ 153A-224, 153A-225, 153A-225.2

184.   Upon information and belief, at all relevant times, Forsyth County, acting under color of state law, had *de facto* policies, practices, and customs in effect that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of the detention officers and medical providers at the Detention Center, as alleged above, including:

   a.   failing to implement proper plans, policies, or procedures to ensure that inmates and detainees held at the Detention Center receive appropriate, necessary, and adequate medical care and protection from dangerous or life-threatening medical conditions;

   b.   Failing to draft or institute proper plans, policies or procedures designed to protect the health and welfare of inmates and detainees at the Detention Center;

   c.   Failing to draft or institute proper plans, policies, or procedures regarding medical supervision of inmates and detainees at the Detention Center;

   d.   Failing to draft or institute proper plans, policies, or procedures regarding emergency medical care for inmates and detainees at the Detention Center;

e. To the extent that the proceeding plans, policies, or procedures exist, in failing to see that such policies or procedures were followed;

f. Failing to implement proper and reasonable policies and procedures regarding the evaluation, monitoring, supervision, and observation of inmates and detainees in the Detention Center who are displaying serious medical symptoms that require emergency care;

g. Failing to use care in selecting a vendor to provide healthcare services for inmates and detainees at the Detention Center;

h. Delegating its obligation to provide medical care to inmates or detainees in the Detention Center to a vendor with a proven track record of providing grossly negligent care to inmates and detainees and acting with deliberate indifference to serious medical needs of inmates and detainees under their care;

i. Entering into agreements for the provision of medical care for inmates and detainees at the Detention Center that incentives the vendor company and its healthcare providers to avoid providing appropriate medical care or seeking off-site medical services for inmates or detainees; and

j. Other policies, customs, and practices to be identified during the course of discovery or at trial.

185. As a direct and proximate result of the County's policies, practices, and customs, which deprived Mr. Neville of his constitutional and federal rights as alleged herein, Mr. Neville died a slow, painful, terrifying, preventable, and totally unnecessary death while in the custody of the Detention Center and totally unable to fend for himself. Consequently, Plaintiff, on behalf of Mr. Neville's Estate, is entitled to recover from the County compensatory damages in an amount in excess of $25,000.00.

## COUNT SIX
### Wrongful Death, Negligent Hiring, Retention, and Supervision
### (Against Wellpath)

186.     Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

187.     At all relevant times, Defendant Wellpath held itself out as an entity providing healthcare for correctional facilities, including the services it provided at the Detention Center.

188.     Wellpath represented to Mr. Neville and to the general public that Wellpath, its physicians, nurses, staff, agents, employees, and assigns possessed the requisite degree of knowledge, ability, and skill possessed by reasonably competent healthcare providers practicing under the same or similar circumstances as those involving Mr. Neville's care.

189.     Wellpath owed Mr. Neville a duty to care for and treat him using reasonable and ordinary care in accordance with the skill, training, and experience of reasonably competent medical care providers practicing under the same or similar circumstances in the same or similar communities as those involving Mr. Neville; to exercise reasonable care and diligence in the application of its staff's knowledge and skill to Mr. Neville's care; and for its staff to use their best judgment in the treatment and care of Mr. Neville.

190.     Wellpath violated that duty of care by:

      a.     Failing to pay attention to Mr. Neville's Medical Intake Form that was completed upon his admission to the Detention Center on December 1, 2019, which should have informed them that he had asthma and was a special needs detainee;

55

b.      Failing to ensure that accurate information was entered into the medical records and disseminated to ensure proper coordination and function of its nurses, healthcare providers, and other staff;

c.      Failing to ensure that existing medical orders for Mr. Neville to receive an asthma inhaler four times per day were followed;

d.      Failing to send Mr. Neville to receive care from a hospital after he experienced a medical emergency on December 2, 2019;

e.      Failing to know or use the Plan as it relates to medical emergencies, special needs inmates, or restraints;

f.      Failing to train its employees and agents about how they should use the Plan as it relates to medical emergencies, special needs inmates, or restraints for Mr. Neville when conducting an assessment of his condition after he first fell from his bunk on December 2, 2019 or when leaving him alone in a cell in a prone position;

g.      Failing to supervise its employees and agents to ensure that they followed the Plan as it relates to medical emergencies, special needs inmates, or restraints for Mr. Neville when conducting an assessment of his condition after he first fell from his bunk on December 2, 2019 or when leaving him alone in a cell in a prone position;

h.      Failing to ensure that its nurses, healthcare providers, and other staff were properly qualified and trained to be able to recognize the signs and symptoms of a serious medical condition or medical emergency;

i.      Failing to ensure that its employees or agents properly evaluated, examined, and otherwise assessed Mr. Neville after he first began exhibiting symptoms or before leaving him alone in a cell in a prone position;

j.      Failure to ensure that its physicians properly evaluated, examined, and otherwise assessed Mr. Neville while he was in the Detention Center;

56

k.     Failing to provide appropriate physician supervision to nurses, healthcare providers, and other staff who provided medical care to Mr. Neville;

l.     Failing to take Mr. Neville to the infirmary where there was more space to treat him, thereby avoiding the cramped space of the second cell, which was the proximate cause and reason the handcuff key broke;

m.     Failing to properly assess Mr. Neville's medical crisis which resulted in the deployment of the SRT who are trained and exist for the purpose of quelling unrest or to address disciplinary problems in the jail; and

n.     Other negligence as might be determined through discovery and trial in this matter.

191.    Because of the numerous incidents where an inmate or detainee died after Wellpath's physicians, nurses, staff, agents, employees, or assigns were deliberately indifferent to the serious medical needs of inmates or detainees at the Detention Center, Wellpath knew or should have known that its physicians, nurses, staff, agents, employees, and assigns were not competent and fit to provide appropriate medical care.

192.    Similarly, because of the numerous incidents where an inmate or detainee died after Wellpath's physicians, nurses, staff, agents, employees, or assigns were deliberately indifferent to the serious medical needs of inmates or detainees at the Detention Center, Wellpath knew or should have known that it failed to appropriately train or supervise its physicians, nurses, staff, agents, employees, and assigns.

193.    Wellpath is also responsible for RN Heughins who worked for Wellpath. As such, it is liable for her acts that were negligent, grossly negligent, willful and wanton, and reckless acts and omissions described above, because she was acting within the course and

57

scope of her employment or agency with Wellpath. As such, Wellpath is liable for the conduct of RN Heughins and such conduct is imputed to Wellpath through the doctrines of agency, vicarious liability, and *respondeat superior*.

194.    Wellpath's failures and violations of the standard of care were negligent, grossly negligent, willful and wanton, and reckless.

195.    Wellpath's acts constitute a proximate cause of Mr. Neville's injuries and death and led directly to and caused Mr. Neville's harm as set forth more fully below.

196.    As a result of Wellpath's acts, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover compensatory and punitive damages under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. § 28A-18-2.

197.    As a direct result of Wellpath's failures, negligence, violations of the standard of care, gross negligence, and willful and wanton and reckless acts, Mr. Neville died a slow, painful, terrifying, totally preventable, and unnecessary death. Consequently, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00.

198.    Wellpath's failures, negligence, gross negligence, and violations of the standard of care were malicious, corrupt, intentional, illegal, unreasonable, needless, willful and wanton, and it acted with conscious and reckless disregard of Mr. Neville's life and safety.

199.    Furthermore, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish Wellpath for its

illegal, egregiously wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

## COUNT SEVEN
### Wrongful Death
### (Against RN Heughins in Her Individual Capacity)

200.  Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

201.  At all relevant times, RN Heughins held herself out as a registered nurse providing professional services to detainees at the Detention Center, and represented to Mr. Neville and to the general public that she possessed the requisite degree of knowledge, ability, and skill possessed by a reasonably competent registered nurse practicing under the same or similar circumstances.

202.  RN Heughins owed Mr. Neville a duty to care for and treat him using reasonable and ordinary care in accordance with the skill, training, and experience of a reasonably competent registered nurse practicing under the same or similar circumstances in the same or similar communities as those involving Mr. Neville; to exercise reasonable care and diligence in the application of her knowledge and skill to Mr. Neville's care; and to use her best judgment in the treatment and care of Mr. Neville.

203.  RN Heughins violated those duties by:

   a.  Failing to timely review Mr. Neville's Medical Intake Form that was completed upon his admission to the Detention Center on December 1, 2019, which should have informed her that he had asthma and was a special needs detainee;

59

b.       Failing to timely send Mr. Neville to receive care from a hospital after he experienced a medical emergency on December 2, 2019;

c.       Failing to know or use the Plan as it relates to medical emergencies, special needs inmates, or restraints;

d.       Failing to assess whether the restraints used on Mr. Neville were appropriate pursuant to the Plan or medical standards of care or to communicate any assessment to the SRT Unit;

e.       Failing to properly evaluate, examine, and otherwise assess Mr. Neville's condition after he fell from his bunk or before RN Heughins and the SRT Unit left Mr. Neville alone in a cell in a prone restraint;

f.       Failing to recognize the severity of Mr. Neville's condition after he fell from his bunk or before RN Heughins and the SRT Unit left Mr. Neville alone in a cell in a prone restraint; and

o.       Other acts and omissions as might be determined through discovery and trial in this matter.

204. RN Heughins failures and violations of the standard of care were negligent, grossly negligent, willful and wanton, and reckless. RA Heughins' acts constitute a proximate cause of Mr. Neville's injuries and death and led directly to and caused Mr. Neville's harm as set forth more fully below. As a result of RN Heughins' acts, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover compensatory and punitive damages under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. § 28A-18-2.

205. RN Heughins' failures and violations of the standard of care were malicious, corrupt, intentional, illegal, unreasonable, needless, willful and wanton, and she acted with conscious and reckless disregard to Mr. Neville's life and safety. Based on RN Heughins'

conduct, she is not entitled to immunity from personal liability and may be sued in her individual capacity.

206. As a direct result of RN Heughins' failures and violations of the standard of care, Mr. Neville died a slow, painful, terrifying, totally preventable, and unnecessary death. Consequently, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00.

207. Furthermore, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish RN Heughins for her illegal, egregiously wrongful, reckless and willful misconduct and to deter others from engaging in similar conduct in the future.

**COUNT EIGHT**
**Wrongful Death**
**(Against Sheriff Kimbrough and Lieutenant Williams**
**in Their Individual and Official Capacities)**

208. Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

209. Sheriff Kimbrough and Lieutenant Williams owed the following duties to Mr. Neville:

    f. To ensure that detention officers, nurses, other medical care providers, agents, and employees assigned to work at the Detention Center performed their duties in such a way as to avoid placing Mr. Neville in danger of injury or death;

    g. To ensure that detention officers, nurses, other medical care providers, agents, and employees assigned to work at the Detention Center would be present and available to provide continuous supervision of Mr. Neville so that his custody would be secure and he would be protected;

61

h.  To ensure that detention officers, nurses, other medical care providers, agents, and employees assigned to work at the Detention Center would supervise Mr. Neville sufficiently to maintain safe custody and control of Mr. Neville;

i.  At all times to be informed of Mr. Neville's general health and any emergency or dangerous medical issues; and

j.  To ensure that routine and emergency medical care would be provided in the event that Mr. Neville needed any such medical care while he was incarcerated in the custody of the Sheriff at the Detention Center.

210.  Sheriff Kimbrough and Lieutenant Williams breached these duties by, *inter alia*:

a.  Failing to adequately train, supervise, instruct, or monitor officers or medical care providers assigned to the Detention Center in the proper method for evaluating inmates and detainees;

b.  Failing to adequately train, supervise, instruct, or monitor officers or medical care providers assigned to the Detention Center in the proper method for identifying inmates and detainees in need of serious medical attention;

c.  Failing to adequately train, supervise, instruct, or monitor officers or medical care providers assigned to the Detention Center in the proper methods for assisting and treating inmates and detainees with serious medical conditions or who were experiencing medical emergencies;

d.  Failing to see that proper methods were being employed to evaluate the medical condition of inmates and detainees in the Detention Center;

e.  Failing to see that proper methods were being employed to assist and treat inmates and detainees in the Detention Center with serious medical conditions or who were experiencing medical emergencies;

f.  Failing to properly supervise officers or medical care providers assigned to the Detention Center;

62

g.  Failing to properly train or supervise agents, employees, medical care providers, and officers so that inmates and detainees, including Mr. Neville, were provided with protection and care while incarcerated;

h.  Failing to draft or institute proper policies or procedures necessary to see that inmates and detainees were provided appropriate, necessary and adequate medical care, and protection from emergency and perilous medical conditions;

i.  If such policies or procedures existed, failing to follow them in providing for the appropriate medical care, protection and care necessary to ensure Mr. Neville's well-being;

j.  Failing to implement and train agents, employees, officers, nurses, and other medical care providers in proper and reasonable policies or procedures regarding the evaluation, monitoring, supervision, observation, and housing of inmates and detainees in the Detention Center including, and especially inmates and detainees who have serious medical conditions or who are experiencing a medical emergency;

k.  Failing to see that officers or medical care providers who worked at the Detention Center complied with existing policies and procedures;

l.  Failing to see that officers or medical care providers who worked at the Detention Center complied with applicable statutes and administrative codes; and

m.  In other ways to be identified during the course of discovery or trial.

211.  At the time that the SRT Unit and RN Heughins committed the negligent, grossly negligent, willful and wanton, and reckless acts and omissions described above, they were acting within the course and scope of their employment or agency with Sheriff Kimbrough. As such, Sheriff Kimbrough is liable for the conduct of these other Defendants

63

and such conduct is imputed to Sheriff Kimbrough through the doctrines of agency, vicarious liability, and *respondeat superior*.

212. As a direct and proximate result of the negligent, grossly negligent, willful and wanton, and reckless acts and omissions described above of Sheriff Kimbrough and Lieutenant Williams, and the other Defendants which are imputed to Sheriff Kimbrough, Mr. Neville died a slow, painful, terrifying, totally preventable, and unnecessary death. Consequently, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00 from Sheriff Kimbrough and Lieutenant Williams, in their individual and official capacities.

213. Furthermore, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish Sheriff Kimbrough and Lieutenant Williams for their illegal, egregiously wrongful, reckless and willful misconduct committed by their agents and employees and to deter others from engaging in similar conduct in the future.

## COUNT NINE
### Wrongful Death
### (Against Corporal Roussel and Officers Poole, Stamper, and Woodley in Their Individual and Official Capacities)

214. Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

215. Corporal Roussel and Officers Poole, Stamper, and Woodley owed the following duties to Mr. Neville:

    a. To avoid placing Mr. Neville in danger of injury or death;

64

b. To provide continuous supervision of Mr. Neville so that his custody would be secure and he would be protected;

c. To supervise Mr. Neville sufficiently to maintain safe custody and control of Mr. Neville;

d. At all times to be informed of Mr. Neville's general health and any emergency or dangerous medical issues;

e. To ensure that routine and emergency medical care would be provided in the event that Mr. Neville needed any such medical care while he was incarcerated in the custody of the Sheriff at the Detention Center; and

f. To use proper methods for restraining Mr. Neville.

216. Corporal Roussel and Officers Poole, Stamper, and Woodley breached these duties by, *inter alia*:

a. Failing to properly evaluate Mr. Neville's medical needs;

b. Failing to identify that Mr. Neville was in need of serious medical attention;

c. Failing to assist and treat Mr. Neville when he was experiencing a medical emergency;

d. Failing to use proper methods to assist and treat Mr. Neville when he was experiencing a medical emergency;

e. Failing to provide or arrange for Mr. Neville to receive appropriate, necessary and adequate medical care, and protection from emergency and perilous medical conditions;

f. If such policies or procedures existed, failing to follow them in providing for the appropriate medical care, protection and care necessary to ensure Mr. Neville's well-being;

g. Failing to comply with applicable statutes and administrative codes;

h. Placing Mr. Neville in an unreasonably dangerous prone restraint for a prolonged period of time; and

i.   In other ways to be identified during the course of discovery or trial.

217.   At the time that Corporal Roussel and Officers Poole, Stamper, and Woodley committed the negligent, grossly negligent, willful and wanton, and reckless acts and omissions described above, they were acting within the course and scope of their employment or agency with Sheriff Kimbrough.

218.   As a direct and proximate result of the negligent, grossly negligent, willful and wanton, and reckless acts and omissions described above, Mr. Neville died a slow, painful, terrifying, totally preventable, and unnecessary death. Consequently, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00 from Corporal Roussel and Officers Poole, Stamper, and Woodley, in their individual and official capacities.

219.   Furthermore, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish Corporal Roussel and Officers Poole, Stamper, and Woodley for their illegal, egregiously wrongful, reckless and willful misconduct committed by their agents and employees and to deter others from engaging in similar conduct in the future.

## COUNT TEN
**Injury to Prisoner by Jailer, N.C. Gen. Stat. § 162-55**
**(Against Sheriff Kimbrough, Lieutenant Williams, Corporal Roussel, Officers Poole, Stamper, and Woodley, and RN Heughins)**

220.   Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

66

221.     Mr. Neville was committed to the custody and care of Sheriff Kimbrough, Corporal Roussel, Lieutenant Williams, Officers Poole, Stamper, and Woodley, and RN Heughins, and the other detention staff and medical providers who worked at the Detention Center from December 1, 2019 to December 2, 2019, as alleged above.

222.     These Defendants were all "keepers of the jail" (i.e., the Detention Center) pursuant to N.C. Gen. Stat. § 162-55.

223.     The conduct of these Defendants with regard to the lack of attention, negligence and gross negligence related to Mr. Neville, as alleged above, was so careless, wanton, and reckless that it demonstrated a thoughtless disregard of consequences and a heedless indifference to his safety and rights.

224.     The conduct of these Defendants, as alleged above, was a proximate cause of Mr. Neville's death and constituted a wrong or injury to Mr. Neville pursuant to N.C. Gen. Stat. § 162.55.

225.     Sheriff Kimbrough and Lieutenant Williams are liable for the conduct of the other detention staff and medical providers who worked at the Detention Center from December 1, 2019 to December 2, 2019, as alleged above, in his supervisory capacity. As such, all of the conduct described above is imputed to Sheriff Kimbrough by way of the doctrines of agency, vicarious liability, and *respondeat superior*. All of the conduct as described above, other than Sheriff Kimbrough's conduct, is imputed to Lieutenant Williams by way of the doctrines of agency, vicarious liability, and *respondeat superior*.

67

226. As a direct and proximate result of the conduct of Sheriff Kimbrough and his employees' or agents' conduct, as alleged above, Mr. Neville died a slow, painful, terrifying, preventable, totally unnecessary death in the Detention Center. Consequently, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover from Sheriff Kimbrough and Lieutenant Williams, in their individual and official capacities, compensatory damages in an amount in excess of $25,000.00 pursuant to N.C. Gen. Stat. § 162-55.

227. Furthermore, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover treble damages as set out in N.C. Gen. Stat. § 162-55.

## COUNT ELEVEN
### Gross Negligence
### (Against All Defendants)

228. Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

229. Defendants owed the duties to Mr. Neville as a detainee of the Detention Center, which duties are alleged in detail above.

230. Defendants breached those duties as alleged in detail above.

231. Defendants' conduct, which includes, *inter alia*, their failure to provide Mr. Neville an asthma inhaler as ordered, failure to recognize the severity of Mr. Neville's medical condition or to obtain appropriate emergency medical care, and improper use of restraints such that Mr. Neville was held in a prone position for a prolonged period of time while he pleaded that he could not breath, was willful, wanton, and done with reckless indifference to Mr. Neville's rights and wellbeing.

68

232. As a direct and proximate result of the grossly negligent, willful and wanton, and reckless acts and omissions described above, Mr. Neville died a slow, painful, terrifying, totally preventable, and unnecessary death. Consequently, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00 from Defendants.

233. Furthermore, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish Defendants for their illegal, egregiously wrongful, reckless and willful misconduct committed by their agents and employees and to deter others from engaging in similar conduct in the future.

## COUNT TWELVE
### Common Law Battery
**(Against Sheriff Kimbrough, Lieutenant Williams, Corporal Roussel, and Officers Poole, Stamper, and Woodley in their Individual and Official Capacities)**

234. Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

235. Corporal Roussel and Officers Poole, Stamper, and Woodley, by forcibly restraining Mr. Neville and using the prone restraint described above intentionally touched Mr. Neville's person without his permission in a harmful manner.

236. At the time that Corporal Roussel and Officers Poole, Stamper, and Woodley committed the battery, they were acting within the course and scope of their employment or agency with Sheriff Kimbrough.

237. Corporal Roussel and Officers Poole, Stamper, and Woodley acted with malice and corruption in committing a battery against Mr. Neville as evidenced by, *inter*

*alia*, their callous behavior in joking and laughing while Mr. Neville was unable to breath in a prone position and responding to Mr. Neville's complaint that he could not breath by telling him that he was breathing because he was talking and yelling.

238. While the battery was ongoing, Lieutenant Williams came to the cell where Corporal Roussel and Officers Poole, Stamper, and Woodley were pinning Mr. Neville to the floor in a prone restraint. Upon witnessing this battery, Lieutenant Williams instructed the SRT Unit to straighten Mr. Neville's legs but did not instruct anyone to sit Mr. Neville up or place him on his side or to cease battering Mr. Neville. Lieutenant Williams, having ratified the battery, is liable for the conduct of Corporal Roussel and Officers Poole, Stamper, and Woodley through the doctrines of agency, vicarious liability, and *respondeat superior*.

239. Sheriff Kimbrough is liable for the conduct of Corporal Roussel and Officers Poole, Stamper, and Woodley and such conduct is imputed to Sheriff Kimbrough through the doctrines of agency, vicarious liability, and *respondeat superior*.

240. As a direct and proximate result of the battery described above, Mr. Neville died a slow, painful, terrifying, totally preventable, and unnecessary death. Consequently, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover compensatory damages in an amount in excess of $25,000.00 from Sheriff Kimbrough, Lieutenant Williams, Corporal Roussel, and Officers Poole, Stamper, and Woodley, in their individual and official capacities.

241.    Furthermore, Plaintiff, on behalf of Mr. Neville's estate, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish these Defendants for their illegal, egregiously wrongful, reckless and willful misconduct committed and to deter others from engaging in similar conduct in the future.

## DAMAGES

242.    Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

243.    At the time of his death, Mr. Neville had five children and an expectation of living out the rest of his life for many years. Defendants' actions deprived Mr. Neville and his family from having an opportunity to fulfill these humble wishes and destroyed these familial bonds.

244.    As a direct and proximate result of these wrongful and negligent actions by Defendants, Mr. Neville and his estate suffered loss and is entitled to recover from Defendants, jointly and severally, under both the North Carolina Wrongful Death Statute N.C. Gen. Stat. § 28A-18-2 and 42 U.S.C. § 1983, compensation for the totally avoidable and unnecessary pain and suffering Mr. Neville experienced leading up to his death, from December 2, 2019 until December 4, 2019; funeral expenses incurred for his burial; the value of services, protection, care and assistance of Mr. Neville to his heirs and loved ones; and any other damages or expenses incurred by Mr. Neville or his estate resulting from the wrongful and negligent actions by Defendants that led to his death.

Case 1:21-cv-00758-CCE-JEP   Document 1   Filed 09/28/21   Page 71 of 74

245.     Plaintiff is also entitled to recover from Defendants, jointly and severally, treble damages pursuant to N.C. Gen. Stat. § 162-55.

246.     By reason of the grossly negligent, reckless, malicious, needless, willful and wanton conduct of Defendants, as alleged above, as well as Defendants' conscious disregard for the safety of Mr. Neville, Plaintiff, on behalf of Mr. Neville's estate, is entitled to receive punitive damages under both the state and federal law in an amount to be determined at trial but in excess of $25,000.00 to punish Defendants' for their illegal, unconstitutional, unlawful, egregiously wrongful, reckless, willful and wanton misconduct and to deter such conduct by others in the future.

## RULE 9(J) STATEMENT FOR ALL
## MEDICAL MALPRACTICE CAUSES OF ACTION

247.     Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

248.     Plaintiff submits that Rule 9(j) of the North Carolina Rules of Civil Procedure is unconstitutional under both the state and federal constitutions and violates, among other things, his equal protection rights, due process rights, his right to equal and open access to the courts, and the right to a jury trial as set forth in Amendments VII and XIV of the United States Constitution and Article I, Sections 1, 6, 18, 19, and 25 and Article IV, Sections 1 and 13 of the North Carolina Constitution. However, without waiving this objection and out of an abundance of caution, Plaintiff certifies that medical healthcare providers, each of whom Plaintiff reasonably believes will qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence, have each reviewed the medical

72

care that Defendants Heughins and Wellpath provided to Mr. Neville and all the medical records pertaining to the alleged negligence that are available to Plaintiff after a reasonable inquiry. These healthcare providers are willing to testify that the medical care complained of did not comply with the applicable standard of care.

### OBJECTION TO CAP ON NON-ECONOMIC DAMAGES FOR ALL MEDICAL MALPRACTICE CAUSES OF ACTION PURSUANT TO N.C. GEN. STAT. 90-21.19

249.    The allegations in the Paragraphs above are incorporated by reference.

250.    Plaintiff objects to N.C. Gen. Stat. § 90-21.19 which purports to place a cap on non-economic damages in a medical malpractice case, because it violates both the state and federal constitutions, and violates, among other things, his equal protection rights, due process rights, his right to equal and open access to the courts, the right to a jury trial, violates the separation of powers, and confers an exclusive emolument on health care providers and the insurance companies that provide them with professional malpractice insurance as set forth in Amendments VII and XIV of the United States Constitution and Article I, Sections 1, 6, 18, 19, 25, and 32 and Article IV, Sections 1 and 13 of the North Carolina Constitution.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Mr. Neville's estate, respectfully prays this Honorable Court that he have and recover judgment against Defendants in their individual and official capacities, jointly and severally as follows:

73

1.      Compensatory damages in an amount in excess of twenty-five thousand dollars ($25,000);

2.      Treble damages pursuant to N.C. Gen. Stat. § 162-55;

3.      Punitive damages in accordance with the law in an amount to be determined by a Jury;

4.      That the costs of this action including, but not limited to, pre-judgment and post-judgment interest charged at the legal rate and attorneys' fees pursuant to 42 U.S.C. § 1988 and as otherwise allowed by law be assessed against Defendants from the time of the filing of this action until paid;

5.      For jury trial on all issues of fact; and

6.      For any and all further relief as to the Court may seem just and proper.


Respectfully submitted, this the 28th day of September, 2021.

/s/ Richard J. Keshian
Richard J. Keshian, NC Bar No. 10681
Starling Underwood, NC Bar No. 40139
Whitney R. Pakalka, NC Bar No. 52611
Kilpatrick Townsend & Stockton LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone:  (336) 607-7300
Facsimile:  (336) 607-7500
Emails:  rkeshian@kilpatricktownsend.com
          sunderwood@kilpatricktownsend.com
          wpakalka@kilpatricktownsend.com

*Attorneys for Plaintiff, Sean Neville, as Administrator of The Estate of John Elliott Neville*

74